ESTATE OF UTTING: TRACHTE, Claimant, Appellant, vs. ESTATE OF UTTING, Respondent.

*January 16—February 25, 1947.*

98

*J. Charles Pile* of Dodgeville, for the appellant.
*Charlton H. James* of Dodgeville, for the respondent.

FRITZ, J.   The appellant, Mildred Trachte, alleged in her amended complaint that in or about February, 1940, she entered into an oral contract with Mattie Utting (the deceased, who was her aunt), in and by which appellant promised and agreed to perform personal services, care, and attention for the decedent from the date thereof and to continue for and during her life, in consideration for which the decedent promised and agreed to bequeath in her will a cash legacy to be paid to claim-

ant equivalent to and sufficient to provide her $200 per month for each month thereafter during the remainder of claimant's life; that thereafter until the decedent's death and in full and complete performance of and compliance with said contract claimant fully performed for decedent in all respects such services as she agreed were to be performed by claimant; that the decedent failed and neglected to perform her part of said contract and to make provisions in her will for compensating claimant under said contract, which was, at the death of decedent, and still is unperformed on her part. In his amended answer the special administrator alleged on information and belief that no such contract ever existed as alleged in claimant's complaint; and he denied that claimant ever performed any personal services under the alleged contract or otherwise, or gave care and attention to the decedent.

On the trial of the resulting issues claimant, in order to prove her alleged contract with decedent, relied primarily upon testimony given by her witness and intimate friend, Russell Kuenzi, and by whom she was employed as his housekeeper, that on a Saturday afternoon in or about the month of February, 1940, he accompanied the claimant from Madison, Wisconsin, where they then resided, to the Waukesha Springs Sanitarium at Waukesha, Wisconsin; that there in a room occupied by decedent the claimant visited with her, and that while Kuenzi was also in the room about fifteen minutes he heard the decedent say,—

"Mildred, I am getting older each day; and my physical condition is not so good. . . . I need your companionship more and more, and help, all the time; and if you will continue to give me care and attention and personal services from time to time that I require, I will leave you by will a sum of money that will pay you $200 a month for the rest of your life;"

and that claimant replied, "Okay, Mrs.—Okay Aunt Mattie." There is no testimony by any other witness that such words were used in such a conversation. But there is testimony by

claimant which could be deemed to be in corroboration of her claim that there was such a visit and that there were conversations on other occasions which could be deemed to corroborate the making of some contract. And in this latter respect some corroboration could have been inferred from circumstances on other occasions which were testified to by claimant's daughter, if the court had considered that testimony credible.

On the other hand there was considerable evidence by the testimony of a number of other witnesses and by documentary proof, which amply and clearly sustained and warranted the court's statements in the written decision, findings, and conclusions of law to the following effect. In his decision, Judge KOPP stated:

"Kuenzi,—in testifying as to the conversation between claimant and Mrs. Utting,—was positive this was in February or early in March, 1940, and the claimant also testified that, in company with Kuenzi, 'she saw Mrs. Utting in Waukesha in her room at the Waukesha Springs Sanitarium late in February, 1940. .. . .'

"However, the defendant established beyond all controversy that Mrs. Utting left Wisconsin or Chicago in January, 1940, for Arizona, California, and Texas and did not return until some time in April. . . . The fact that there is such a wide discrepancy between the date claimed by claimant and the other proven facts as to the whereabouts of Mrs. Utting at the time of making the alleged contract casts grave doubt on the veracity of claimant and some at least of her witnesses. In cases of this kind there must be no uncertainty on vital issues. If the claimant be allowed to allege one day of the making of the contract she should not be allowed on the trial, when defendant has had no opportunity of checking the facts, to vacillate and say, in effect, 'Well, it was made some time within a few months of when I stated.' Against such a claim a defendant estate could not defend.

"Now, what are the proven facts independently established, keeping in mind that claimant and her only witness stated definitely that the alleged transaction occurred in a room in the Waukesha Springs Sanitarium 'sometime late in February or

early in March,'—not 'sometime late in January or early in February,' 1940. The records of the LaFayette Hotel in Chicago, where the deceased lived, showed positively that she checked out January 24, 1940, and was not again registered until April 14, 1940. The clerk and manager of the hotel testified positively as to the accuracy of the books. He knew Mrs. Utting well. In fact, this testimony was introduced by the claimant herself. The testimony of Chester Smith and his wife, Ida Smith, of Phoenix, Arizona (a disinterested witness, he being a nephew of deceased), showed that Mrs. Utting, the deceased, arrived in Phoenix, Arizona, late in January, 1940; that she stayed there until March 5th when he put her on a train bound for Los Angeles; that he saw her get off the train when she returned to Phoenix, March the 24th, and put her on the train March 27th bound for Tucson, Arizona; that they knew that she went from Tucson to El Paso for a period of a few days. Checks of the deceased to hotels in Phoenix, Los Angeles and El Paso corroborated this testimony almost absolutely. There was no check for her first week in Phoenix, but that is relatively unimportant; and the last check to the Hotel Cortex in El Paso, was dated April 9, 1940, presumably at the end of her stay; and she checked in at the LaFayette Hotel in Chicago April 14, 1940. It is seldom that the evidence can be procured from which it is possible to reconstruct the whereabouts of a person over a vital period of three or four months as definitely as has been established in this case. Not only the testimony of the witnesses is clear and convincing but it is almost entirely corroborated by documentary evidence. This establishes the whereabouts of Mrs. Utting from late in January of 1940 to April 14, 1940, as in the western part of the United States. If, therefore, there were no other testimony, the court would be compelled to find as an established fact that Mrs. Utting was not in Waukesha between late in January, 1940, and April 14, 1940.

"However, there is other testimony. Miss Hiller, who for more than twenty-five years was bookkeeper and assistant manager of the Waukesha Springs Sanitarium, was in court with the book which showed when guests and patients arrived at and left the said sanitarium. She testified that they were absolutely accurate and were almost entirely in her own handwriting; and that those books showed that Mrs. Utting was

never at the Waukesha Springs Sanitarium in 1940 until sometime in the month of August. . . .

"Claimant's whole case is built with great particularity upon the fact that the contract was made at this time and in this place as stated. If it be shown that it could not have been made at that time and place or within several months of the time stated, then certainly the contract has not been established by clear and satisfactory evidence—a primary requirement in such cases. It leads the court to no other conclusion than that the essential fact of agreement has not been established by the weight of the evidence, to say nothing of being established by clear and satisfactory evidence as required. It is true that Miss Hiller's testimony is negative in character but it is competent, in the court's opinion, and is strong corroboration of the other credible evidence as to the whereabouts of Mrs. Utting in January, February, March and April of 1940 and that she was not in the Waukesha Springs Sanitarium until August 17th in the year 1940. . . .

"Claimant attempted to prove that she had rendered substantial service to her aunt. All that the evidence showed, taken at its face, was that the claimant called upon and visited with her aunt from time to time. She claimed that she gave her alcohol rubs, occasionally read to her, and did business for her, but could give no instance of the transaction of any business. When the aunt was ill she always had nurses, as she was wealthy and could afford them and evidently had them. Her business was looked after by one of the leading banks and trust companies of Chicago; and so it is inconceivable that claimant (especially in view of her habits) could either give her any real attention or transact any business for her. Mr. Karsten, manager and day clerk of the LaFayette Hotel, testified that from April 14, 1940, to May, 1943, the aunt was at the hotel four hundred and seventy-one days and nights and that during that time, in the daytime at least, claimant did not call on or visit her aunt more than two or three times; that during all of this period the aunt was in fair health and went out to her meals wheresoever she desired.

"Sister Mary Joseph, superior and superintendent of St. Joseph's Hospital of Dodgeville, Wisconsin, testified that Mrs. Utting's room from October 2d, 1944, to her death July 9, 1945, was almost across the hall from her office; . . .

that in her opinion Mrs. Trachte, the claimant, did not call on the aunt more than four or five times during all this time . . . and did nothing more than to visit with her for not to exceed one-half hour at a time; that during that time the aunt did not phone at all to Mrs. Trachte. The court feels that the proof does not show the performance of any substantial service for the decedent during the years involved, certainly none that would be considered a probable consideration for the large gift which it is claimed the decedent agreed to make, or such as to arouse the equitable conscience of the court in a suit for specific performance or for damages as the case at bar. . . .

"It is evident from all of the evidence that during the years 1940 to 1945 the claimant's personal habits were not good and that the aunt lost confidence in her. Several witnesses testified to the aunt's statement to that effect. Documentary evidence shows that the claimant was repeatedly importuning the aunt to give her money. Nurses and other witnesses testified to the fact that this, together with claimant's personal habits, greatly disturbed the aunt. In the last will and testament that was admitted to probate there is one very significant clause, the third. After bequeathing $10,000 to one nephew and $5,000 to another nephew, she says: 'I am not unmindful of other children of my deceased sisters, but I purposely omit them from the provisions of this my last will and testament for purposes well known to me.' No doubt the claimant and other relatives are disappointed, but that is something about which the court can do nothing."

Manifestly, in view of those facts and circumstances thus stated in the written decision and findings of fact, the court rightly concluded: That the decedent was not in the Waukesha Springs Sanitarium or in the state of Wisconsin between the last days of January and April 14, 1940, that she was in the western part of the United States at all times during that period, and the first time she was in the Waukesha Springs Sanitarium in 1940 was on August 17th; that claimant has not proven any contract for services between herself and decedent, by the terms of which she was to render any services for decedent or the latter was to bequeath any sum of money to claim-

ant, or proven any contract along these lines between herself and the decedent; moreover, that claimant was not in condition during most of the time between the date of the alleged contract and the death of decedent to perform any services for her of the nature claimed to have been contracted for, and that during said period claimant rendered no substantial service for decedent, and for any incidental services rendered claimant was compensated; and that claimant has not proven or established any cause of action against decedent's estate, and that claimant's complaint should be dismissed upon the merits and judgment entered accordingly.

The evidence was overwhelmingly in favor and support of defendant's contentions and the court's statements in relation thereto in its decision, findings, and conclusions of law. The testimony of Kuenzi, and of the claimant and her daughter, and her other witnesses, upon which claimant relied to establish that there was any such contract and performance thereof, as she claimed, could rightly be considered by the court to be not only incredible, but to be also neither so clear, satisfactory, and convincing as is necessary to establish liability on such a claim against the estate of a deceased for services alleged to have been rendered under an oral contract with the deceased to pay claimant therefor. As this court said in *Estate of Brill*, 183 Wis. 282, 289, 197 N. W. 802,—

"There are very obvious reasons why contracts of this character should not be sustained unless they are clearly proven by satisfactory evidence. Such contracts may divert from the natural channels large portions of an estate. It is quite natural that those who have rendered services for one since deceased should magnify their value, and if contracts of this character for the division of estate are too much favored, the door is opened for unscrupulous claimants to base their claims on equivocal promises or documents claimed to be lost, to the great prejudice of heirs or legatees. Such contracts have been described as dangerous and subject to the closest scrutiny."

See also *Will of Dereg,* 187 Wis. 425, 204 N. W. 579; *Will of Goldrick,* 198 Wis. 500, 224 N. W. 741; *Estate of St. Germain,* 246 Wis. 409, 17 N. W. (2d) 582; *Dilger v. Estate of McQuade,* 158 Wis. 328, 148 N. W. 1085; *Estate of McLean,* 219 Wis. 222, 262 N. W. 707; *Hamlin v. Stevens,* 177 N. Y. 39, 69 N. E. 118.

Claimant's contentions that certain rulings by the court in relation to the admission or exclusion of evidence and its rulings in certain other respects constituted prejudicial and reversible error cannot be sustained. There is no occasion to discuss any of them here, except possibly the rulings in the course of the following proceedings which resulted in ultimately admitting Miss Hiller's testimony to the effect that the decedent was not at the Waukesha Springs Sanitarium in 1940 until the month of August. In the course of these proceedings a book was produced by the respondent's counsel, but was not offered by either party nor received in evidence. According to Miss Hiller's testimony she currently wrote in that book the names and dates on which guests or patients arrived at and left the Waukesha Springs Sanitarium. She testified:

"The book which I have is true and correct to the best of my knowledge and the record was made in the due course of business, and as a part of the system of records of the Waukesha Springs Sanitarium. It contains a correct statement as to the times when Mrs. Trachte and Mrs. Utting stayed at the institution.

"I am satisfied that neither Mrs. Mildred Trachte or Mrs. Mattie Utting ever stayed or had a room at said institution at any other time except such as set forth in my record book. This record book is all in my own handwriting. . . ."

"*Q.* As a result of said examination, Miss Hiller, and from looking at the record book that you now have in your hand, will you please tell us whether Mildred Trachte or Mattie Utting was a patient, guest, or had a room at said Waukesha Springs Sanitarium in either of the months of

January, February, or March, 1940? *A.* Well, they weren't there in either January, February, or March, 1940."

"From an examination of this book I would state that neither Mrs. Trachte or Mrs. Utting were at the Waukesha Springs Sanitarium in January, February or March, 1940."

"This book is used in connection with making out statements of accounts. . . . this is the original. We had other books besides this one but this was used in connection with the patient's account. . . . This is the book of original entries. . . . All the books but this book have been destroyed. When the sanitarium was closed we destroyed all the case histories and many of the records. I do not think there are any in existence prior to 1941. . . . The testimony which I have given today is all taken from this book marked Exhibit 58."

"(The Court) *Q.* Let me ask you one question, just simply amplifying the ones that Mr. James has just asked: Are you confident from your examination of this book which is in your handwriting, and from your personal knowledge of the situation, that Mrs. Utting was not at this sanitarium in the year 1940 prior to August? *A.* Yes."

As it is thus evident that Miss Hiller's answer that Mrs. Utting was not at the sanitarium in 1940, prior to August, was from her examination of the book which was in her own handwriting and made in due course of business as a part of the records of the sanitarium, and that even without reference to the information found in the book she can testify from her own personal knowledge of the situation that Mrs. Utting was not at the sanitarium in 1940 prior to August, the court did not err in permitting Miss Hiller's answer "Yes" (last quoted above) to stand. *Dahl v. H. C. Crook Realty Co.* 208 Wis. 506, 508, 243 N. W. 426; *Campbell v. Germania F. Ins. Co.* 163 Wis. 329, 338, 159 N. W. 63. Moreover, there does not appear to have been any objection to the court's question, or any motion to strike out the answer.

*By the Court.*—Judgment affirmed.