56 B.R. 981 (1986)
In the Matter of James W. LEMANSKI and Martha A. Lemanski, Debtors.
Michael E. KEPLER, Trustee, Plaintiff,
v.
Charles L. SCHMALBACH and Ann H. Schmalbach, Defendants.
Michael E. KEPLER, Trustee, Plaintiff,
v.
Clarence LEMANSKI and Estelle Lemanski, Defendants.
Michael E. KEPLER, Trustee, Plaintiff,
v.
WHIPPLE AND SOUTHWELL, S.C., Defendant.
Adv. Nos. 85-0063-7 to 85-0065-7.
United States Bankruptcy Court, W.D. Wisconsin.
February 6, 1986.
*982 Carlyle H. Whipple, Madison, Wis., for defendants.
Michael E. Kepler, Madison, Wis., for plaintiff.

MEMORANDUM DECISION
ROBERT D. MARTIN, Bankruptcy Judge.
These consolidated adversary proceedings arise out of related pre-petition transfers of the debtors, James and Martha Lemanski. The trustee, Michael Kepler has sought to avoid the transfers pursuant to 11 U.S.C. §§ 547 and 548, to recover the same pursuant to 11 U.S.C. § 550, and to preserve the voided transfers for the benefit of estate pursuant to 11 U.S.C. § 551.[1]
In 1980, while experiencing financial difficulties on their farm, the debtors obtained loans from their parents ("the parents"), to wit: $20,000.00 from defendants Clarence and Estelle Lemanski, parents of debtor James Lemanski, and $10,000.00 from Charles and Ann Schmalbach, parents of debtor Martha Lemanski. It is undisputed that both of the loans were unsecured. In 1981 the debtor Martha Lemanski received a mortgage as part of her inheritance from the estate of Sherman Cox. On December 6, 1983, she executed a partial assignment of the mortgage to each set of parents. The parents admit that they did not request or know of the assignments in their favor and did not receive the documents. The parents also admit that they gave no new value for the assignments. The partial assignments were recorded with the Register of Deeds of Dane County on December 6, 1983. The parents did not learn of the assignments until they were satisfied in August of 1984.
On February 3, 1984, Martha Lemanski executed an additional partial assignment of the Cox Estate mortgage to the defendant Whipple & Southwell, S.C. ("Whipple"), the debtors' attorneys. That assignment was given to "collateralize" an unsecured balance of $1,914.33 owing to the law firm for services previously rendered and to provide security for services to be rendered in the future. This partial assignment was recorded on February 3, 1984. To the extent the partial assignment to Whipple secured *983 amounts previously owing there was no exchange of new value.
The three partial mortgage assignments were satisfied on August 15, 1984. Clarence and Estelle Lemanski received $30,861.94; Charles and Ann Schmalbach received $15,430.97; and Whipple received $3,967.23.
On November 16, 1984, the debtors filed for relief under chapter 7 of the Code. The parents allege that they had no knowledge of the debtors' financial status until the bankruptcy petition was filed. Whipple alleges that it had no knowledge of the debtors' financial status until it began working on the debtors' bankruptcy petition in October of 1984. Evidence adduced at trial supports the contention of the parents that they did not have detailed knowledge of the debtors' financial condition either at the time they received the partial mortgage assignments in December of 1983 or at the time the assignments were satisfied on August 15, 1984. Evidence is less clear as to Whipple's awareness of the debtors' financial condition in February of 1984 when it received the partial mortgage assignment.

I.
In this action the trustee is relying on the "insider" provision of section 547(b)(4)(B) since the transfers in question occurred more than ninety days but less than one year before the filing of debtors' petition. The parents are "insiders" by Code definition because they are relatives of the debtors by blood or marriage. 11 U.S.C. § 101(28)(A)(i), (37).[2]See In Re Montanio, 15 B.R. 307, 309-310 (Bankr.D. N.J.1981). The status of Whipple is less clear. Attorneys are not automatically considered to be insiders under the Code. An attorney is an insider if as a matter of fact, he exercises such control or influence over the debtor as to render their transactions not arms-length.[3] Evidence showed that while Whipple has represented the debtors on several occasions over the last ten years or so, it did not exercise the requisite "high degree of influence or control" necessary for insider status. Nothing in the facts established at trial showed anything more than a history of "arms-length" dealing between Whipple and the debtors. At the time of the assignment the debtors had requested Whipple to undertake substantial additional legal work on their behalf. Whipple prevailed upon the debtors to grant it security for a large past due balance. No control over the debtors was demonstrated in that pair of straightforward business transactions. The demeanor of the debtors on the witness stand reinforces this conclusion. Both James and Martha Lemanski appeared to be thoughtful, articulate, and intelligent individuals who were not in any degree acting under coercion or other abuse of the attorney-client relationship. They simply desired to receive further legal services from Whipple and were willing to provide the security required by the firm to guarantee payment. Since Whipple was not an insider of the debtors neither the mortgage assignment *984 of February 3, 1984 in its favor nor the cash satisfaction of that assignment on August 15, 1984 may be avoided by the trustee.

II.
The trustee contends that section 547 of the Code as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 is applicable to the transfers to the parents.[4] The parents contend that since the mortgage assignments in question took place before the effective date of the 1984 amendments the provisions of section 547 in effect at the time of the assignments are the applicable law. The effect of the 1984 amendment of section 547(b)(4)(B) was to remove the requirement that an insider have "reasonable cause to believe the debtor was insolvent" in order to avoid a transfer to the insider.[5] The parents argue that it is unconstitutional to apply the new statute to a transaction which occurred before the law came into effect, relying on United States v. Security Industrial Bank, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). Although the Supreme Court in Security Industrial Bank refused to apply 11 U.S.C. § 522(f) retroactively, it did not decide the constitutionality of such an application of the statute. Id. at 74, 103 S.Ct. at 410. The court merely found that there was "substantial doubt" whether such an application was constitutional. Id. at 78, 103 S.Ct. at 412. Because of the "substantial doubt" involved, the court reasoned that the appropriate construction was that Congress did not intend section 522(f)(2) to be applied retroactively. Id. at 78-82, 103 S.Ct. at 412-14. Therefore, Security Industrial Bank does not say that retroactive application of a statute is per se unconstitutional.
Furthermore, the situation in Security Industrial Bank is not at all analogous to the one in this proceeding. The creditors in Security Industrial Bank obtained valid liens prior to the enactment of section 522(f). It is clear that the creditors in Security Industrial Bank necessarily relied on the prior law when they took their security interests. See footnote 8, infra. In the present case the new version of section 547 had already been enacted when the parents received repayment of their loans on August 15, 1984.[6] Thus there was notice that if the debtors filed for relief after October, 1984 the new section would be applicable to the transactions. Numerous analagous cases dealing with the "gap period" between the enactment and effective date of section 522(f) have held that the "retroactive" divestment of gap period transactions is not unconstitutional. See *985 e.g. In Re Sweeney, 7 B.R. 814, 819 (Bankr. E.D.Wis.1980), reversed sub. nom., In Re Gifford 669 F.2d 468 (7th Cir.1982); reinstated on reh. en banc, 688 F.2d 447 (7th Cir.1982), and cases cited therein; In Re Steinart, 4 B.R. 354, 358 (Bankr.W.D.La. 1980); In Re Beck, 4 B.R. 661 (Bankr.C.D. Ill.1980); In Re Head, 4 B.R. 521 (Bankr.D. Tenn.1980).[7]
Similarly, the application of section 547 to the "gap" between the enactment and effective dates of the Code (November 6, 1978 to October 1, 1979) was held constitutional in In Re Caro Products, Inc., 746 F.2d 349 (6th Cir.1984). The court in Caro Products refused to apply Security Industrial Bank to the matter before it stating:
we do not believe that the reasoning of Security Industrial Bank applies to the constitutional question presented.
Preliminarily, it should be noted that the Court there specifically stated that its holding does not apply to post-enactment but pre-effective date transfers.
. . . .
There is no question but that Congress could have, consistent with the requirements of the Fifth Amendment, expressly made § 547(b) of the 1978 Reform Act effective as of the date of enactment. Instead, Congress expressly provided that the Act would apply to cases commenced on or after the effective date, October 1, 1979, and that § 547(b) would apply to transfers which occurred within 90 days of the filing of the petition. . . . Accordingly, we conclude that application of § 547(b) to the transfer involved here does not raise a substantial constitutional question, and therefore we need not apply the canon of construction that would have us seek to avoid application of § 547(b) to this transfer.
Id. at 352.
Even if the application of current section 547(b)(4)(B) in this matter were considered to be a "retroactive application" of which the creditors had no notice the result might not differ. The change in the statute simply removed the trustee's burden of proving an insider's state of mind in order to avoid a transfer. If it is established that at the time of the transfers the debtor was insolvent, then the parents received payments with constructive notice that the payments could be recovered from insiders as preferences under section 547. To say that the parents relied on the law as it existed before the 1984 amendments would be to say that they knew (or had reasonable cause to believe) that the debtors were insolvent, but did not think the trustee could prove that they had such knowledge. Unlike the situation in Security Industrial Bank this would not be reasonable reliance on a prior state of the law.[8] The "retroactive" application of section 547(b) in this circumstance is not fundamentally unfair nor will such application lead to a manifestly unjust result. See Bradley v. Richmond School Board, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974); In Re Kuehndorf, supra.
Further, the parents' former right to put the trustee to the burden of proving an insider's state of mind cannot be elevated to the level of a concrete property interest. *986 The change in section 547, even if "retroactive," does not alter a prior vested property right. Rather it merely eases the standard for divesting a property right which was already subject to avoidance under the insider preference provision. This is quite different from the situation in Security Industrial Bank where the change in section 522(f) acted to divest interests that had never previously been subject to divestment in bankruptcy. In the present case the rationale of In Re Prima, 88 F.2d 785, 788-89 (7th Cir.1937), is applicable. There the court found that even secured interests may be affected by lawful future changes in the bankruptcy laws since contracting parties act with notice of Congress' authority to modify existing rights through changes in the bankruptcy laws. See also Wright v. Union Central Life Ins. Co., 304 U.S. 502, 516, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490 (1938), reh. den. 305 U.S. 668, 59 S.Ct. 56, 83 L.Ed. 433 (1938); In Re Hutcherson, 133 F.2d 959 (7th Cir.1943). While Prima and Hutcherson may not go so far as to approve the sort of wholesale divestment of a prior vested interest which was disapproved in Security Industrial Bank, the cases do seem to stand for the proposition that Congress may make reasonable modifications in prior vested rights such as the one in this proceeding. See also In Re Beck, 4 B.R. at 664; Wright v. Vinton Branch of Mountain Trust Bank, 300 U.S. 440, 470, 57 S.Ct. 556, 565, 81 L.Ed. 736 (1937).

III.
In order to recover a preferential transfer under section 547(b) of the Code the trustee must establish the
transfer of an interest of the debtor in property 
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made 
(A) on or within 90 days before the date of the filing of the petition; or
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;
(5) that enables such creditor to receive more than such creditor would receive if 
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. § 547(b) (as amended July 10, 1984). In this proceeding it is admitted that Martha Lemanski transferred an interest in a mortgage for the benefit of the parents on account of pre-existing debts and that the partial mortgage assignments were later satisfied with cash. It is not disputed that both the initial assignments and the cash payments occurred within the insider preference period and that as a result of the transfers the parents have received more than they would otherwise be entitled to in a chapter 7 case.
The preferential transfers to the parents occurred on August 15, 1984. The law in Wisconsin is that a conveyance of an interest in real property is not effective unless delivered and accepted. See WIS. STAT. §§ 706.01, 706.02(1)(g); Herzing v. Hess, 263 Wis. 617, 58 N.W.2d 430 (1953); Estate of Rahn, 230 Wis. 108, 283 N.W. 285 (1939); Dixon v. Davidson, 202 Wis. 19, 231 N.W. 276 (1930); Estate of Brill, 183 Wis. 282, 197 N.W. 802 (1924); Roberts v. McGrath, 38 Wis. 52 (1875). While no particular form is necessary to accomplish delivery of a conveyance[9] there must, as in any other contract, be a meeting of the minds of the parties, one to convey and the other to receive before an agreement is consummated. See Curry v. Colburn, 99 Wis. 319, 320, 74 N.W. 778 (1898); Bogie v. Bogie, 35 Wis. 659, 667 (1874).
*987 To constitute a valid delivery, the grantor must intend to deliver, must part with physical possession of the conveyance, and must relinquish all control over the conveyance. See Estate of Rahn, supra, 230 Wis. at 111, 283 N.W. 285; Prutsman v. Baker, 30 Wis. 644, 646 (1872). While some cases have held that actual manual delivery is not always required, see Erbach v. Brauer, 188 Wis. 312, 315, 206 N.W. 62 (1925); Bogie v. Bogie, 35 Wis. 659 (1874), the intention of the grantor to effect a present conveyance must be properly shown. Continued possession of a deed by the grantor, while not conclusive, is strong and persuasive evidence of an intention not to deliver the deed to the grantee, particularly where neither the language of the deed nor other circumstances indicate a present intent to convey. See Erbach v. Brauer, supra, 188 Wis. at 317, 206 N.W. 62.
Delivery of a conveyance may be made to a third party acting on behalf of the grantee, and as long as the conveyance is transferred out of the grantor's control the delivery is valid, even if ultimate conveyance to the grantee depends on a future contingency. See e.g. Prosser v. Nickolay, 249 Wis. 75, 77, 23 N.W.2d 403 (1945). However when the grantor delivers a deed or other instrument to a third party but retains control over the deed, delivery is not effected. See Estate of Rahn, supra; Estate of Brill, supra, 183 Wis. at 288, 197 N.W. 802; Kittoe v. Willey, 121 Wis. 548, 550, 99 N.W. 337 (1904); Cooper v. Jackson, 4 Wis. 537, 550 (1855).
Further, it appears to be the rule that when an otherwise valid delivery is made to a third party without the knowledge or consent of the grantee, the delivery is ineffective to convey his interest to the grantee until he accepts the conveyance. See Cooper v. Jackson, supra at 547-50. In McPherson v. Featherstone, 37 Wis. 632, 641-42 (1875), the court stated that when a deed has been delivered to a stranger for the benefit of the grantee, who is ignorant of its execution, the conveyance may later be accepted by the grantee providing the rights of third parties have not intervened. See also Cooper v. Jackson, supra, 4 Wis. at 549.
Whether or not a conveyance delivered to a third party is effective to transfer an interest in real estate to the grantee is primarily a question of fact to be determined from all the circumstances of the transaction. See Hamblyn v. Crase, 194 Wis. 628, 630-31, 217 N.W. 311 (1928); Kittoe v. Willey, supra; Chaudoir v. Witt, 170 Wis. 556, 174 N.W. 925 (1920); Erbach v. Brauer, 188 Wis. at 318, 206 N.W. 62. The recordation of an otherwise valid mortgage constitutes prima facie evidence of delivery which may be rebutted by evidence of non-delivery, thereupon shifting the burden of proof to the defendants. See Harmon v. Myer, 55 Wis. 85, 86, 89, 12 N.W. 435 (1882).
The parents have stipulated that no delivery of the mortgage assignments was ever made to them and that they never had knowledge of the assignments in their favor until the assignments were "satisfied" on August 15, 1984. (See stipulation of facts for trial, Nos. 4 and 11. See also defendants' proposed findings of fact and conclusions of law, findings of fact Nos. 5 and 12.) Despite this express stipulation the defendants' attorney claimed for the first time at trial that he was acting as the parents' agent when he retained the executed assignments. Under Wisconsin law agency cannot be established by statements of the putative agent made outside the scope of his actual or implied authority. Boehck Construction Equipment Corp. v. Voight, 17 Wis.2d 62, 75, 115 N.W.2d 627 (1962). Agency requires in the first instance "the express or implied manifestation of one party that the other party shall act for him." Id. at 68, 115 N.W.2d 627. See also Peabody Seating Co. v. Jim Cullen, Inc., 56 Wis.2d 119, 201 N.W.2d 546 (1972). Further, the burden of proving agency under Wisconsin law appears to rest upon the party claiming the existence of an agency relationship. See Boehck Construction, 17 Wis.2d at 77, 115 N.W.2d 627. The suggestion of an agency relationship is seriously weakened by the admission of the parents that they never requested collateral for their loans and had no *988 knowledge of the assignments in question. One of the parents, Clarence Lemanski, expressly testified that he did not agree to have Whipple act as his agent. Further it is clear that in the transaction in question Whipple was acting as the debtors' attorney and not as the agent of the parents.
In applying the principles discussed above to this proceeding it is more likely than not that delivery never occurred. First, the parents expressly denied that delivery ever occurred. Second, the physical retention of the assignments by the debtors' attorney taken together with the admitted fact that the parents were not informed of the assignments until August 15, 1984 creates a strong inference that the assignments remained within the debtors' control. These facts are sufficient to overcome any presumption of delivery created by the recordation of the assignments.
Even if the debtors intended to make a present conveyance, the earliest the parents could have accepted the conveyances was on August 15, 1984 when the loans were paid off and the assignments were released. The reconveyance of a deed never previously accepted does not necessarily amount to an acceptance of the prior conveyance. See Dixon v. Davidson, supra. However, even if the releases did constitute ratification and acceptance of the original assignments, it appears to be the rule that such ratification cannot work to the prejudice of prior accrued rights. See McPherson v. Featherstone, supra. To the extent that the trustee would be prejudiced by the defendants' ratification of the assignments such ratification is void.[10] Thus for bankruptcy purposes the assignments were void and the preferential transfers to the parents occurred on August 15, 1984 when the original unsecured loans were satisfied.
Evidence in the record shows that more likely than not the debtors were insolvent on August 15, 1984 when the preferential transfers to the parents were made. The pleadings of the trustee allege that on August 15, 1984 the debtors had total liabilities of approximately $328,732.09 and total non-exempt assets of $270,765.25. These figures are derived by adding to the amount of liabilities in the debtors' schedules certain obligations which were paid by the debtors previous to filing. The parents state in their proposed findings of fact that
The debtors were not insolvent at any time prior to October 15, 1984, inasmuch as their assets less exempt items were $180,095 and their liabilities were $147,942. The debtors were unaware until October 15, 1984, that they could not substantiate their $50,000.00 counterclaim in a suit being brought against them by Robert and Dorothy Swenson. . . .
The trustee does not include the $50,000.00 counterclaim as an asset because of the contingent nature of the claim and because the claim eventually proved to be worthless. Thus even accepting the parents' summary of the debtors' net worth it is clear that the debtors were insolvent at the time of the transfer if the $50,000.00 counterclaim was not properly considered an asset.
Under the Code insolvency means that the sum of the debtors' obligations is greater than all of the debtors' property fairly valued, not including property transferred to hinder creditors or property that is exempt under section 522. See 11 U.S.C. § 101(29).[11] The "fair valuation" requirement *989 means that assets in the nature of disputed contingent claims must be appropriately discounted. See In Re Arrowhead Gardens, Inc., 32 B.R. 296 (Bankr.D.Mass. 1983) affirmed sub. nom., Briden v. Foley, 776 F.2d 379 (1st Cir.1985); In Re Fulghum Const. Co., 7 B.R. 629 (Bankr.M.D. Tenn.1980) affirmed 14 B.R. 293 (M.D. Tenn.1981); vacated in part on other grds., 706 F.2d 171, 8 C.B.C.2d 644, 10 B.C.D. 702 (6th Cir.1983), cert. den. sub. nom., Ranier & Associates v. Waldschmidt, 464 U.S. 935, 104 S.Ct. 342, 78 L.Ed.2d 310 (1983). Although the parents allege that the debtors were unaware that their counterclaim could not be substantiated until October 15, 1984, they fail to cite any authority in support of their implied argument that the claim had actual value prior to October 15, 1984, merely because the debtors thought it had value. Although this argument is imaginative, it is seriously undermined by Martha Lemanski's testimony that it was clear as of August 1984 that the debtors would not be able to obtain witnesses in their favor on the counterclaim. The unavailability of witnesses was the chief reason that the counterclaim was formally abandoned in October of 1984. Thus even if the debtors' subjective valuation of the counterclaim is of any importance, the debtors knew in August of 1984 that their counterclaim was worthless. Since it is clear that the counterclaim was worthless when the preferential transfers occurred it cannot be counted as an asset of the debtors on August 15, 1984. See In Re Fulghum Const. Co., supra at 638 (when there is no buyer likely to pay anything for a given asset, the value of the asset is zero). Therefore, based on the parents' own calculation of the debtors' net worth, but corrected for the worthless claim, the debtors net assets totalled $130,095.00 and their liabilities totalled $147,942.00. Thus the debtors' liabilities exceeded their assets by $17,847.00 and they were insolvent within the meaning of the Code. 11 U.S.C. §§ 101(29), 547(b)(3).
Even if the mortgage assignments were valid and the preferential transfers occurred on December 6, 1983, the trustee has adequately established insolvency as of that date. When a debtor is shown to be insolvent at a date later than the date of transfer and it is shown that his financial condition did not change during the interim, insolvency at the earlier date may be inferred. See Hassan v. Middlesex County National Bank, 333 F.2d 838 (1st Cir.1964) cert. den. 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964); In Re Arrowhead Gardens, Inc., 32 B.R. at 301. The parents allege that the debtors' net assets were $180,096.00 and liabilities were $147,942.00. The $50,000.00 counterclaim was just as worthless on December 6, 1983 as it was later since no prudent buyer would have purchased the claim. The parents have not specifically disputed any of the figures the trustee relies on to prove insolvency. They appear to have centered their entire argument for solvency on the $50,000.00 counterclaim which in fact was worthless. Although the trustee bears the burden of proof on insolvency in this matter, the parents were obligated to rebut the evidence of insolvency introduced. This they have failed to do. The trustee has thus established all the elements of a preferential transfer and is entitled to recover from the parents.
Upon the foregoing which constitute my findings of fact and conclusions of law an order for judgment may be entered in favor of the trustee.
NOTES
[1] On June 12, 1985, the court granted defendants' motion to dismiss counts of the trustee's complaint relating to section 548. Trial on the remaining counts which arose under section 547 was held on August 28, 1985.
[2] 11 U.S.C. § 101 provides in relevant part:

(28) `insider' includes 
(A) if the debtor is an individual 
(i) relative of the debtor or of a general partner of the debtor;
(ii) partnership in which the debtor is a general partner;
(iii) general partner of the debtor; or
(iv) corporation of which the debtor is a director, officer, or person in control;
. . . .
(37) `relative' means individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree.
11 U.S.C. § 101(28)(A), (37).
[3] The definition of "insider" under section 101 is not exclusive. There is a well-defined case law test for "insiders" who are not among the enumerated categories. That test defines an insider as:

one who has such a relationship with the debtor that their dealing with one another cannot be characterized as an arms-length transaction.
In Re Montanino, supra at 310.
An `insider' generally is an entity whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny. . . . Who will qualify as an insider must be held as a question of fact.
In Re Taylor, 29 B.R. 5, 7 (Bankr.W.D.Ky.1983) (citation omitted).
[4] The current version of 11 U.S.C. § 547 was enacted on July 10, 1984 and was made applicable to all cases filed ninety days after the date of enactment. See Act July 10, 1984, P.L. 98-353, Title III, Subtitle K, section 553(a), 98 Stat. 392. The debtors' case was filed on November 16, 1984 after the Act became effective. See also In Re Kuehndorf, 24 B.R. 555, 556 (W.D.Wis.1982). Although Kuehndorf may stand overruled by implication by In Re Brandstaetter, 767 F.2d 324, 13 B.C.D. 599, 601 (7th Cir.1985), the holding of Kuehndorf is broader than necessary to support application of the current law in the instant matter since Kuehndorf allowed post-petition changes in the Code to govern proceedings whose substantive transactions occurred prior to the change. In the instant matter the change in section 547 became effective before the filing of the debtors' petition and thus is expressly applicable to this proceeding.
[5] Before the 1984 amendments, the trustee could avoid preferential transfers to an insider:

(4) made 
. . . .
(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer 
(i) was an insider; and
(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer. . . .
11 U.S.C. § 547(b)(4) (1978). Since the 1984 amendments, section 547(b)(4)(B) reads:
(b) . . . the trustee may avoid any transfer . . .
. . . .
(4) made 
. . . .
(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider. . . .
11 U.S.C. § 547(b)(4) (1984).
[6] The preferential transfers to the parents occurred on August 15, 1984, when the loans were repaid and not on December 6, 1983, when the purported mortgage assignments occurred. See pages 986-988, infra.
[7] The Supreme Court in Security Industrial Bank expressly declined to discuss the validity of section 522(f) in "gap" cases. See id., 459 U.S. at 82, n. 11, 103 S.Ct. at 414, n. 11.
[8] In Security Industrial Bank it is entirely possible that the commercial lender in question would have required some alternative collateral, charged a higher rate of interest, shortened repayment schedules and/or imposed stricter credit screening had it known in advance of the change in section 522(f). In the matter sub judice, there is little if anything to suggest that the parents considered the bankruptcy implications of the various transactions in question, except that the debtors appear to have waited for ninety days to pass after the time of the "satisfaction" of the mortgage assignments before filing for bankruptcy. At that time it was still far to early to avoid the effect of the insider transfer provision and at best the parties could only have "hoped" that the prior state of the law might work in their favor. Certainly the bankruptcy implications inherent in the parents' earlier decisions to advance unsecured credit to the debtors were not at all considered. Similarly, since the parents were not even aware of the partial mortgage assignments until August 15, 1984 it is clear they could not have relied on the former state of the law prior to that time. Under these circumstances "reliance" cannot be assumed.
[9] "A `conveyance' is a written instrument, evidencing a transaction governed by this chapter, which satisfies the requirements of s. 706.02." WIS.STAT. § 706.01(4).
[10] For bankruptcy purposes the trustee's rights can be considered to have "accrued" one year prior to the debtors' petition in bankruptcy due to the insider preference provision of 11 U.S.C. § 547(b)(4)(B).
[11] 11 U.S.C. § 101(29) provides:

(29) `insolvent' means 
(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of 
(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
(ii) property that may be exempted from property of the estate under section 522 of this title; and
(B) with reference to a partnership, financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation 
(i) all of such partnership's property, exclusive of property of the kind specified in subparagraph (A)(i) of this paragraph; and
(ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property of the kind specified in subparagraph (A) of this paragraph, over such partner's nonpartnership debts.